## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOSE LUIS SANTOS,** | : | **No. 3:06cv2472** |
| **Petitioner** | : | |
| | : | **(Judge Munley)** |
| | : | |
| **v.** | : | |
| | : | |
| **DAVID DIGUGLIELMO,** | : | |
| **THE DISTRICT ATTORNEY OF** | : | |
| **DAUPHIN COUNTY,** | : | |
| **PENNSYLVANIA, and** | : | |
| **THE ATTORNEY GENERAL OF THE** | : | |
| **STATE OF PENNSYLVANIA,** | : | |
| **Respondents** | : | |

### MEMORANDUM

Before the court is the report and recommendation of Magistrate Judge

Malachy E. Mannion, which proposes this court dismiss the instant petition for a writ

of habeas corpus.  Having been briefed, the matter is ripe for disposition.

**Background**

This case arises out the March 29, 2001 conviction of petitioner Jose Luis

Santos for rape, statutory sexual assault, endangering the welfare of children and

corrupting the morals of a minor.  The conviction took place in Dauphin County,

Pennsylvania.  A jury on November 17, 2000 convicted petitioner on these charges

stemming from the rape of the five-year-old daughter of his girlfriend.  The trial court

sentenced petitioner on March 29, 2001 to a sentence of between 12 ½ and 25

years.  The Pennsylvania Superior Court upheld the sentence and conviction on

June 27, 2002.  Petitioner then sought leave to appeal his case to the Supreme

Court of Pennsylvania.  The Supreme Court declined to hear this appeal on

November 13, 2002.

On April 2, 2003, petitioner filed a *pro se* petition attacking his conviction

pursuant to the Pennsylvania Post-Conviction Relief Act ("PCRA"), 42 PA. CONS.

STAT. § 9541.  Petitioner also filed a motion for post-conviction DNA testing.  He

received post-conviction counsel for the proceeding under the PCRA, and this

counsel filed a supplemental petition.  On December 30, 2004, the PCRA court

denied petitioner relief under the act and denied him the post-conviction DNA testing

he requested.  Petitioner appealed this decision to the Pennsylvania Superior Court

on January 28, 2005.  The PCRA court determined, however, that petitioner failed

properly to state the grounds for his appeal and ordered him to file a concise

statement of those grounds by April 11, 2005.  This ruling relied on Pennsylvania

Rule of Appellate Procedure 1925(b).  Petitioner mailed the required statement to

the PCRA Judge, the District Attorney's Office, and the Superior Court

Prothonotary's Office, but failed to file the document with the Clerk of Courts, which

Rule 1925(b) requires.  Accordingly, the Superior Court affirmed denial of the petition

on April 19, 2006, and denied petitioner's motion for reargument on June 22, 2006.

Petitioner did not appeal that decision to the Pennsylvania Supreme Court.

Petitioner filed the instant action in the United States District Court for the

Eastern District of Pennsylvania on September 16, 2006.  (See Doc. 1-2).  The

2

petition raises four grounds for granting the petition: (1) that his counsel was ineffective for refusing to offer the results of DNA testing into evidence to demonstrate that petitioner was not the source of sperm found on the victim and that he was innocent of the crimes for which he was accused; (2) that the DNA evidence collected from the scene establishes petitioner's innocence by demonstrating that someone else perpetrated the assault on the victim; (3) that the prosecutor violated petitioner's constitutional rights by using his peremptory challenges to exclude blacks and Hispanics from the jury; and (4) that petitioner's appellate counsel was ineffective for not raising these issues before the appellate court.  Noting that the petitioner was housed in the Eastern District of Pennsylvania but his conviction occurred in the Middle District of Pennsylvania, United States District Judge Petrese B. Tucker order the case transferred to this court on November 8, 2006.  (Doc. 1).

Upon arriving in this court, the case was assigned to Magistrate Judge Mannion for preliminary consideration.  The Magistrate Judge granted the petitioner's motion for appointment of counsel (Doc. 13).  After the parties briefed the issue, Magistrate Judge Mannion issued his report and recommendation on July 15, 2008 (Doc. 49).  The Magistrate Judge recommended that the court deny the petition.  The petitioner filed objections to the report and recommendation (Doc. 50) and a brief in support thereof (Doc. 51), bringing the case to its present posture.

**Jurisdiction**

Petitioner brought this action pursuant to 28 U.S.C. § 2254.  As such, the court

3

has jurisdiction pursuant to 28 U.S.C. § 1331.  ("The district courts shall have original

jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the

United States.").

**Legal Standard**

In disposing of objections to a magistrate judge's report and recommendation,

the district court must make a *de novo* determination of those portions of the report

to which objections are made.  28 U.S.C. § 636 (b)(1)(C); see also Henderson v.

Carlson, 812 F.2d 874, 877 (3d Cir. 1987).  This court may accept, reject, or modify,

in whole or in part, the findings or recommendations made by the magistrate judge.

The district court may also receive further evidence or recommit the matter to the

magistrate judge with instructions.  Id.

This case concerns petitioner's application for a writ of *habeas corpus*.  To

obtain such relief, a petitioner must show that his trial:

> (1) resulted in a conviction that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme
> Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of
> the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Deciding whether a state court decision was "contrary to" federal law requires

an "inquiry" into "whether the Supreme Court has established a rule that determines

the outcome of the petition."  Matteo v. Superintendent, SCI Albion, 171 F.3d 877,

888 (3d Cir. 1999).  At this stage, "'a habeas petitioner must show that Supreme

Court precedent requires an outcome contrary to that reached by the relevant state

4

court.'" Id. (quoting O'Brien v. Dubois, 145 F.3d 16, 24-25 (1st Cir. 1998)).  Thus, "it

is not sufficient for the petitioner to show merely that his interpretation of Supreme

Court precedent is more plausible than the state court's; rather, the petitioner must

demonstrate that Supreme Court precedent requires the contrary outcome."  Id.

**Discussion**

Petitioner raised four grounds in support of his habeas corpus petition:

1.  That the petitioner received ineffective assistance of counsel when counsel
refused to file a motion to offer the results of DNA testing to demonstrate that
the petitioner was not the source of sperm and to establish the petitioner was
innocent of the crime.
2.  That petitioner's due process rights were violated when he was convicted
of sex offenses when the DNA evidence admitted at trial established that
petitioner was not the source of sperm and therefore not guilty of the crime
which was committed by another male.
3.  That petitioner's due process rights were violated when the prosecutor
used his peremptory challenges to exclude Blacks and Hispanics from the
jury.
4.  That appellate counsel was ineffective for failing to present meritorious
issues to the appellate courts.

The magistrate judge recommends that the court find that claims 1, 3 and 4 have

been procedurally defaulted and that claim 2 lacks merit.  The petitioner objects to all

of these findings.

**A.  Insufficiency of the Evidence**

The magistrate judge addressed the sufficiency of the evidence used to

convict the petitioner in state court, finding that the claim had been fairly presented in

petitioner's state-court appeals.[1]   The magistrate judge recommends that the court

dismiss the petition on those grounds.

In a proceeding pursuant to 28 U.S.C. § 2254, "the applicant is entitled to

habeas corpus relief if it is found that upon the record evidence adduced at trial no

rational trier of fact could have found proof beyond a reasonable doubt."   Jackson v.

Virginia, 443 U.S. 307, 323 (1979).   When reviewing this evidence, the court must

"'view the evidence [presented at trial] in the light most favorable to the prosecution.'"

United States v. Beverly, 99 F.3d 570, 571 (3d Cir. 1996) (quoting United States v.

Messerlian, 832 F.2d 778, 789 (3d Cir. 1987)).   Thus, when a petitioner challenges

the sufficiency of the evidence, "the question is not whether [the reviewing court]

believe[s] that the evidence at trial established guilt beyond a reasonable doubt, but

whether a rational trier of fact could have found the elements of the crime beyond a

reasonable doubt.   The jury . . . weighs the evidence and [the court] must defer to

the jury's resolution of conflicts in the evidence."   Moore v. Deputy Commissioner(s)

of SCI-Huntingdon, 946 F.2d 236, 243 (3d Cir. 1991).   The court's review involves

"the totality of the evidence, both direct and circumstantial," and makes "all available

---

[1]The magistrate judge noted that petitioner's appeals on the ground of insufficient evidence in state court had been raised on state-law grounds.  He rejected the respondents' argument, however, that this failure to raise federal constitutional grounds in state court meant that petitioner could not raise that claim in his *habeas* petition.  The magistrate judge concluded that petitioner's state-court claim was "virtually indistinguishable from the due process allegation" raised in federal court, and thus could be considered to have been exhausted in state court.  (Report and Recommendation (Doc. 49-3) at 20).  The respondents do not object to this finding, and the court will adopt it and consider the merits of petitioner's due process claim based on the alleged insufficiency of the evidence used to convict petitioner.

inferences in favor of the government." <u>United States v. Gambone</u>, 314 F.3d 163,
170 (3d Cir. 2003).

Petitioner argues that he has met this standard because the evidence at trial
was "conflicting," and the DNA evidence presented to the jurors appeared to exclude
him.  He emphasizes that eight pieces of evidence that were subjected to DNA
testing were introduced at trial.  No clear evidence, petitioner claims, connected him
to the rape.  Two of those pieces of evidence–the victim's underwear and the bed
sheet–contained male DNA which did not match the petitioner and belonged to
another male.  Moreover, the petitioner testified at trial that another man had been
present in the home on the day of the rape.  The presence of this other man and the
unidentified DNA on the victim's underwear and bed sheets, combined with the
youth of the victim, who was traumatized and susceptible to police influence,
petitioner insists, means that no rational trier of fact could have found him guilty
beyond a reasonable doubt.

To address petitioner's motion, the court will here recite the relevant evidence
as adduced at trial.  Petitioner's trial took place on November 13-17, 2000 in the
Court of Common Pleas of Dauphin County, Pennsylvania.  (<u>See</u> Doc. 46, Exhibits
to Respondent's Answer to the Petitioner (Doc. 45) Exh. A (hereinafter "T.")).   At
that trial, Jeremy Maugans, an emergency medical technician, testified that he had
responded to a call at the victim's home on March 31, 1999.  (<u>Id.</u> at 138).  When he
arrived at the home shortly before seven a.m., he encountered the victim's mother

7

immediately upon entering the house.  (Id. at 139).  Informed that the subject of the emergency call was "upstairs," he climbed a stairwell and encountered petitioner, who was standing at the bathroom sink brushing his teeth.  (Id. at 140).  Maugans asked petitioner what the problem was, and petitioner indicated that the patient was a young girl sitting on the bathroom floor.  (Id.).

Maugans found the patient seated on the floor between the bathtub and the bathroom wall.  (Id. at 141).  She was "straddling a towel on her knees."  (Id. at 142). Maugans noticed that "[t]here was a large amount of blood on the towel.  There was blood on the floor.  There was blood on the patient's thighs and legs."  (Id. at 147-48).  Maugans asked petitioner, who he later learned was the victim's mother's boyfriend, what had happened to her.  (Id. at 143).  The petitioner responded that she had been outside playing that morning at 5 a.m. and had been injured.  (Id.). The victim declined to explain to Maugans what had caused her injuries.  (Id. at 144).  Maugan then sent his partner to find the patient's mother.  (Id.).  When she arrived, Maugans had her place a gauze pad on the patient, put her underwear on her, and find some pants for her to wear to the hospital.  (Id. at 145).  Maugans then took the patient to the hospital in his ambulance.  (Id.).

Maugans rode in the back of the ambulance with the patient.  (Id.).  He supplied her with oxygen while her mother tried to offer her comfort.  (Id.).  Before transferring the patient to the care of hospital staff, Maugans had a conversation with the girl.  (Id. at 146).   He asked the patient if anyone had hurt her, and she replied

that someone had.  (Id.).  Maugans then asked if the person who had hurt her lived in her home, and she admitted that person did.  (Id.).  When asked if the person who hurt her was her mother's boyfriend, the patient "stated yes."  (Id.).

Edie Baldwin, a registered nurse with extensive experience in sexual assault forensic examination, also testified at trial.  (Id. at 174).  Baldwin was working in the emergency room at the hospital where patient arrived on March 31, 1999.  (Id. at 177).  Night shift nurses approached her that morning to inform her that a young girl had arrived on their unit with vaginal bleeding.  (Id. at 177).  The nurses wanted to know if they should call in a nurse with training in forensic examination for sexual assault.  (Id.).  After determining that the victim's condition was stable, Baldwin assisted another nurse in examining her.  (Id. at 178).  The nurses examined the girl from "head to toe" but did not take any material for testing from her genitalia "because at the opening of her vaginal area [there] was a large blood clot" and dislodging the clot could lead to excessive bleeding.  (Id. at 182-83).  The nurses then called surgeons to treat the victim.  (Id. at 183).

Earl Greenwald, the medical director of the Children's Resource Center at Harrisburg Hospital, also testified at trial.  (Id. at 195).  Dr. Greenwald testified as an expert on child sexual abuse.  (Id. at 200).  After examining the victim's medical records, Dr. Greenwald concluded that her injuries could have been caused by "an erect penis."  (Id. at 210).  He also testified that an adult male who attempted to have sexual intercourse with a young girl could injure his penis.  (Id. at 211).  Extreme

9

disparities in size and a lack of lubrication of the female sexual organ could harm the man's sexual organ.  (Id. at 211).  Dr. Greenwald identified injuries consistent with that cause from photographs of the petitioner shown him in court.  (Id. at 213).  Daniel Weber, an obstetrician/gynecologist who assisted in a surgery performed on the victim, also agreed that the injuries the girl suffered were "consistent with the introduction into the vagina of an erect male penis."  (Trial Transcript (Doc. 45) at 128).

Harrisburg, Pennsylvania Police Officer Wesley Feduke testified at trial as well.  (Id. at 239).   Feduke was dispatched to petitioner's residence at around 7:15 a.m. on the day of the incident.  (Id. at 240).  When he arrived, Feduke knocked on the door and petitioner allowed him and his partner into the home.  (Id. at 241). Petitioner was washing sheets when they arrived.  (Id.).  The officers, aware that they had been dispatched to a rape scene, immediately went over to the washer and turned it off.  (Id.).

Another Harrisburg Police Officer, Patrick Hockley, also testified.  (Id. at 250). He accompanied Officer Feduke to the petitioner's residence.  (Id. at 251).  He was the primary officer on the scene.  (Id. at 252).  When Hockley found out that the washing machine was running, he asked petitioner why he was doing laundry.  (Id.). Petitioner "explained that he was washing his bed sheets because of the mess." (Id.).  The mess to which petitioner referred was that "the sheets were covered in blood."  (Id.).  According to petitioner, "everything else" that had blood on it was also

10

in the washing machine.  (Id.).  Hockley then asked petitioner to turn off the washing

machine.  (Id.).

Petitioner made a statement to Hockley after Hockley turned off the washing

machine.  (Id. at 254).  He explained that on the previous day he had let the children

out to play, checking on them every fifteen minutes.  (Id.).  Around two p.m., he went

outside to check on the children and noticed that the oldest child, the victim in this

case, was walking towards him from the playground.  (Id.).  She did not "look right,"

and seemed to have blood trickling down her leg.  (Id.).  She would not explain to

him what had happened.  (Id.).  Petitioner took the girl inside to check on her and

noticed that she had blood in her panties.  (Id.).  He took her to the bathroom to

wash the blood off.  (Id.).  While cleaning the girl off, petitioner claimed, he noticed

that she had a small cut on her leg.  (Id. at 255).  Officer Hockley took the petitioner

to mean that she had a cut near her vagina.  (Id.).  Petitioner claimed he tried to

provide a pad to soak the blood up, placed the child on the sofa and observed her.

(Id.).  He did not explain the situation to her mother when she arrived home later that

evening, fearing that she "was just too excitable."  (Id.).

Petitioner claimed that he, the child, and the child's mother slept in the same

bed that night so that the adults could watch the child.  (Id.).  The child's mother

became alarmed when the child got up to use the bathroom in the middle of the night

and the mother noticed blood stains on the sheet where her daughter had been

sleeping.  (Id.).  The child's mother called a doctor, who advised observation of the

child.  (Id. at 255).  The next morning, noticing that the child was still bleeding, the

two adults followed the doctor's advice and called an ambulance.  (Id. at 256).  After

this conversation, petitioner agreed to go to the police station and speak to an

investigator.  (Id.).

The victim's mother, Jacqueline Pagan, testified at trial.  (Id. at 324).  She had

been working on the evening of March 30, 1999, the day before she called an

ambulance to her home.  (Id. at 330).  When she arrived home that night around

9:35 p.m., she found the situation somewhat unusual.  (Id.).  Her two older children,

who normally would meet her at the door with hugs and kisses, were in bed.  (Id. at

329).  Her boyfriend, the petitioner, reported that he had fed the children and put

them to bed.  (Id.).  The petitioner was also behaving strangely, following her

wherever she went.  (Id.).  The mother went to the children's bedroom to wish them

good night.  (Id. at 329).  Her daughter, the victim, told her that she had to use the

bathroom, and the mother took her.  (Id. at 329-30).  When he daughter pulled down

her underwear to use the toilet, the mother noticed a bright brown spot.  (Id. at 330).

When the daughter wiped herself, her mother saw "a little bit of blood" on the toilet

tissue.  (Id.).    The mother asked her daughter what had happened to her, but "[a]ll

she did was put her head down and just nod her head like she didn't know."  (Id.).  At

the time she asked her daughter this question, petitioner was standing in the

bathroom doorway.  (Id.).  Her daughter then told her to close the bathroom door,

and she did so.  (Id.).  Once the mother closed the door, she again asked the victim

who had harmed her.  (Id.).  Her daughter replied that "he told me if I tell you that he'll hit me."  (Id.).

Pagan then took her daughter to the bedroom and told her to lay down on the bed.  (Id.).  She examined the girl and discovered that she had a cut on her vagina, which she "tapped" with a Q-tip.  (Id. at 331).  Pagan feared that her daughter had been raped, but was scared that the petitioner would "do something" to her if she accused him.  (Id.).  She went downstairs to try and call her mother, her ex-mother-in-law or her daughter's pediatrician, but the petitioner removed the cord from the phone.  (Id.).  Pagan eventually spoke with the pediatrician, describing her daughter's condition and asking if she could be experiencing her menstrual cycle. (Id. at 332).  She did not, however, tell the pediatrician of her fears that her daughter had been raped.  (Id. at 347).  Indeed, Pagan testified that she was only sure that her daughter had been raped after speaking with a nurse at the hospital.  (Id. at 366).  The doctor did not feel the victim needed to be taken to the hospital, and instead suggested that she had probably either been injured playing outside or had a bladder infection.  (Id. at 332).  The pediatrician suggested that the mother watch her daughter, but only take her to the emergency room if she experienced "a lot" of bleeding.  (Id. at 333).

Pagan slept that night with the victim and her son; she locked the door in an attempt "to protect [her] kids" from the petitioner.  (Id. at 336).  The victim had difficulty sleeping that night, and complained that her stomach hurt.  (Id. at 333).

13

The next morning, her complaints of stomach pain continued, and the girl also told her mother that she had wet the bed.  (Id.).  When the mother checked where her daughter was sleeping, she found a "puddle of blood."  (Id.).  Pagan took her daughter into the bathroom to give her a bath and ease the bleeding.  (Id. at 334).  Her daughter looked pale, and her lips had turned purple.  (Id.).  As her daughter attempted to get out of the bathtub, she collapsed and began to bleed.  (Id.).  Pagan told the petitioner to get some towels so she could try and stop the bleeding, and ran downstairs to call 911.  (Id.).

Harrisburg Police Officer Wendolyn Weaver-Carter also testified at trial.  She had been dispatched to the hospital on March 31, 1999 to "occupy" the victim while her mother was interviewed by police.  (Id. at 370).  She spoke with the girl, but did not discuss any details of the case.  (Id.).  Weaver-Carter contacted the victim again on April 5, 1999.  Aware of the traumatic circumstances of the child's condition, Weaver-Carter decided to visit her in the hospital to check on her.  (Id. at 371).  She met the victim in her hotel room, and the two began talking.  (Id.).  Without any prompting or questioning from Weaver-Carter, the victim told her that "Jose put his body in my body."  (Id.).  Weaver-Carter was unsure whether anyone else was in the room when the victim gave her this information, but testified that the girl's mother and her father's girlfriend had been "in and out of the room" during their conversation.  (Id. at 373).  She did not write the statement down on a piece of paper when she initially heard it, but instead transcribed it later from memory.  (Id. at 374).

14

The police officer did not ask any more questions about the incident.  (Id. at 371).

Instead, she determined to tell investigators what she had heard.  (Id.).  She also

added the details of the conversation, including the victim's statement, to her police

report.  (Id. at 372).

Shineaka Collins, the girlfriend of the victim's father, likewise testified at trial.

After learning of the victim's injuries, she and the girl's father went to the hospital to

comfort her and participate in decisions about her care.  (Id. at 378).  Collins testified

that around April 2 or 3, 1999, she had asked the victim the cause of her

considerable pain.  (Id. at 379).  The victim replied that "Big Luis put his body on her

body."  (Id. at 380).  The victim used the name "Big Luis" because she knew more

than one Luis in connection with her family.  (Id.).  "Little Luis," Collins testified, was

the father of the victim's brother Christian.  (Id.).  "Big Luis," according to Collins,

referred to the petitioner.  (Id.).  The victim also told Collins that "Big Luis" had put

his fingernails into her vagina.  (Id.).  Noticing that this conversation had made the

girl "agitated," Collins did not ask her any other questions about the incident.  (Id. at

381).  The victim did tell her, however, that "Big Luis" gave her a bath.  (Id. at 382).

The victim provided police with another statement on April 6, 1999.  Tanya

Taylor, a police investigator, supervised an interview with the child at the Harrisburg

Hospital on that date.  Present during the interview were David Klinger from Children

and Youth Services and Sue Kolanda from the district attorney's office, Shineaka

Collins, a nurse and victim's mother.  (Id. at 391).  Sue Kolanda, who apparently

"had a better rapport" with the child, handled the questioning.  (Id.).  Though Taylor

was not at the bedside during the interview, she could hear the conversation in the

room.  (Id.).

Taylor made notes of that conversation, and later transcribed them in her

police report (Id. at 392-93).  Kolanda asked the victim how she got her injuries, and

she responded that "Jose put his body on mine" while he was not wearing any

clothes.  (Id. at 394).  When asked to explain what she meant by saying that Jose

put his body on hers, she responded that he had put "his thing, his body in my

toetee."  (Id. at 395).  Taylor took "toetee" to mean vagina, though the victim did not

use that word.  (Id.).  The victim also explained that the part of the petitioner's body

to which she referred was his "pee-pee."  (Id.).  When asked if that part of his body

was "inside your toetee," victim responded "on me."  (Id. at 396).  She also explained

that petitioner had moved "fast" when his "pee-pee" was in her.  (Id.).  His penis had

apparently been erect during this act.  (Id. at 397).  Petitioner had taken her clothing

off after kissing her, and he wore only a towel.  (Id.).  After the incident, petitioner

gave the victim a bath.  (Id. at 396).  When asked if petitioner had done such an act

before, the girld responded that "he did it three times."  (Id. at 397). She did not know

whether petitioner had told her to not to say anything.  (Id.).  When asked which

person first mentioned that the petitioner's body had been inside the victim's, Taylor

responded that it "[w]as the child."  (Id. at 398).

The lead investigator in petitioner's case was Hector L. Baez.  (Id. at 434).  At

trial, he testified that he had been assigned to take the lead in the case because he spoke Spanish.  (Id. at 435).  Baez reported that on March 31, 1999 he had interviewed petitioner about the incident.  (Id. at 436).  According to Baez, petitioner claimed that he had begun watching Pagan's children at 12:30 p.m. on March 30, 1999.  (Id. at 442).  The two older children went outside to play at 2:15.  (Id.). Petitioner kept an eye on the two children, and at the same time fed the seven-month old baby.  (Id.).  After feeding the baby, petitioner began to watch a movie. (Id. at 442-3).  He became distracted by the movie, but eventually remembered the children were outside.  (Id. at 443).  Petitioner opened the door and yelled for the children, who did not answer at first.  (Id.)  Eventually, the victim appeared, walking slowly towards the house.  (Id.).  Petitioner asked what was wrong with the girl and ordered her and her brother inside the house.  (Id.).

Once the girl arrived inside, petitioner claimed that he noticed that she looked pale and "in shock."  (Id.).  He looked down and saw a small amount of dried blood on her side.  (Id.).  Petitioner lifted up the girl's dress to check for injuries, concluding that she had not hurt herself.  (Id.).  Still, he placed the victim in the bathtub and turned on the water.  (Id.).  He gave the girl a small blue dish filled with water to wipe herself, as he was afraid to touch her.  (Id.).  Petitioner told Baez that he did not want to touch the girl because he feared others concluding that he had inappropriate relations with young girls.  (Id. at 443-4).  He always reported to the girl's mother if she became a bit "fresh" with him, or tried to kiss him.  (Id. at 444).  Only after the girl

17

refused to wipe herself did petitioner do so.  (Id.).  Once he had cleaned her to

remove the blood from her legs, petitioner contends that he put a paper towel in the

girl's panties in case she continued bleeding.  (Id.).  The girl then lay on the couch,

complaining of stomach pains.  (Id.).  When the girl's mother came home, petitioner

at first did not tell her what had happened, fearing her reaction.  (Id. at 445).

Eventually, however, the mother noticed the stains in her daughter's underwear and

asked her what happened.  (Id.).  When confronted by Pagan about the girl's claim

that he touched her, petitioner claimed that he admitted only that he had washed the

girl to clean off her wounds.  (Id.).  Petitioner concluded his statement to Baez by

conceding that he should not have washed the girl's clothing, since it might "be

evidence."  (Id.).  He was "nervous," however, and did not know what to do.  (Id.).

    Petitioner agreed to various searches of his person, including a "rape kit."  (Id.

at 447-48).  As Baez was explaining to petitioner the procedure for performing the

rape kit, he urged petitioner to tell him the truth about the incident.  (Id. at 448).  He

warned petitioner that when the victim recovered she would tell Baez exactly what

had happened.  (Id.).  Petitioner responded that "[i]f I was going to molest anyone, it

would have been the baby because she can't talk.  You don't got no evidence.  You

don't got no evidence.  Her word is not enough."  (Id. at 449).  Later, when a nurse,

Virginia Dorsheimer, performed a physical examination of the petitioner, he told that

"[y]ou aren't going to find anything.  I took a shower and washed my clothes."  (Id. at

452).  The examination also revealed a three millimeter round red open area on the

petitioner's penis.  (Id. at 453).  Petitioner blamed his injury on recent sex with his

girlfriend.  (Id. at 454).  He claimed that she had her panties on during the

intercourse.  (Id.).  Later, however, petitioner contended that the mark came when

"they burned something off at York Hospital."  (Id.).  Baez testified that he had

subpoenaed the petitioner's records from both York County Hospital and York

Memorial Hospital.  (Id. at 456, 457).  The records he received, which were

introduced in court, did not support this claim.  (Id. at 456, 458).

The victim testified in court as well.  She related that petitioner had been

caring for her on the day she was injured, and that her mother was at work when the

incident occurred.  (Id. at 472).  According to the victim, petitioner raped her in her

mother's room on her mother's bed.  (Id. at 474).  When the attack occurred, the

petitioner was wearing only a towel.  (Id.).  Petitioner pulled off her clothes and "put

his winkie on" her.  (Id.).  The girl indicated that petitioner had put his "winkie"

between her legs.  (Id. at 475).  She felt "bad" when he did so, and began to cry.

(Id.).  After she started crying, petitioner warned her not to tell her mother.  (Id.).

After the attack, victim testified, she went to the bathroom with the petitioner.  (Id. at

476).  He gave her a bath, washing her "private part."  (Id. at 476-77).  The girl then

went to bed, sleeping on a bed which had "Rugrats" sheets on it.  (Id. at 477).

The girl testified that when she woke up the next morning she discovered that

there was blood in her underwear.  (Id. at 479).  She went to the bathroom and took

another bath.  (Id. at 480).  She bled in the bathtub.  (Id.).  She soon saw a police

19

officer, and an ambulance came to her house. (Id.).  The ambulance took her and

her mother to the hospital.  (Id.).  In court, the girl identified the petitioner as the man

who attacked her in court.  (Id. at 482).  On cross examination, the witness testified

that she told an investigator that she had been "raped," but could not explain how

she had learned that word.  (Id. at 487).

   Petitioner testified in his own behalf at trial.  (Id. at 556).  He related that he

had begun living at his girlfriend's home in the February before his arrest.  (Id. at

557).  At first, he was employed, but eventually lost his job.  (Id. at 557-58).  He then

stayed at home with the three children and helped around the house,

cleaning, cooking and watching the children.  (Id. at 558).  Petitioner

sometimes played with his girlfriend's son, but he never played with her daughter.

(Id. at 559).  He never played with a girl that was not his daughter

because "when you play with girls you try to body slam or whatever, they can

think everything."  (Id.).  He only played with the victim once, and only when

her mother was present and encouraged it.  (Id. at 560).

   On March 30, 1999, petitioner testified, his then-girlfriend went to work around

12:30 p.m.  (Id. at 561).  He was not alone with the children, however.  (Id.).  Another

man, known by him as "Peachy" was also in the home.  (Id.).  Peachy apparently had

some relationship with his girlfriend's family.  (Id.).  When the victim's mother went to

work, petitioner testified, she told Peachy, not him, to watch the children.  (Id. at 562-

63).  Peachy told petitioner that he was leaving to go to a friend's house sometime

around 1:15 p.m., and left.  (Id. at 563-64).

After Peachy left, petitioner watched the children from inside the home as he talked to his brother-in-law on the telephone.  (Id. at 564).  At some point, he was no longer able to see the children.  (Id.).  Around 2:15, petitioner called the children into the house for something to eat.  (Id.).  Only the young boy came at first, but eventually his sister–the victim in this case–appeared.  (Id. at 565).  Her behavior was "strange;" she had a look on her face he had never seen before.  (Id.).  She came inside and sat on the couch.  (Id.).  The victim denied that anything was wrong, but eventually started crying.  (Id. at 565-66).  Examining her, he noticed that she had dried blood on her legs.  (Id. at 566).  The victim refused to explain where the blood had come from.  (Id.).  The petitioner took the girl upstairs to clean her off.  (Id.).  He gave her a rag and told her to wash herself.  (Id.).  When the girl proved unable to do so, he took the rag and cleaned off the side of her leg.  (Id.).  He checked to see if she had a cut, but denied ever touching her "private property."  (Id.).  He never pulled down her pants or her underwear.  (Id. at 567).  Petitioner then called the mother's friends, asking them to call her and inform her of the emergency at home.  (Id.).  He could not call the woman himself because he did not know her number at work.  (Id.).  These friends never called the mother.  (Id. at 568).  Peachy came back to the home around 4 p.m.  (Id. at 568).  He apparently took the victim outside to play with him.  (Id.).

The girl's mother came home around 9:30 p.m.  (Id. at 569).  Petitioner

immediately reported that the victim had come inside with blood on her legs.  (Id.).

He urged the mother to go upstairs and check on her daughter's condition.  (Id. at

570).  The mother went upstairs to the bathroom to take off her makeup and comb

her hair after work.  (Id.).  Petitioner went to the victim's bedroom to check on her.

(Id.).  The girl told him her stomach hurt and she had to go to the bathroom.  (Id.).

He sent her to talk to her mother, who then discovered that the girl was bleeding.

(Id.).  The mother gave her daughter a bath.  (Id. at 571).  After the bath, the girl's

mother told petitioner that her daughter had accused him of touching her.  (Id.).

Petitioner denied any bad intention, telling the mother that his only aim was to clean

blood off the girl's legs.  (Id.).  He claimed that he had slept with the mother and her

children that night, and denied every attempting to prevent the girl's mother from

calling a pediatrician.  (Id. at 572).

When he awoke the next morning, the girl's mother told him that the bleeding

had gotten worse.  (Id. at 573).  He took the girl to the bathroom, where her mother

gave her another bath.  (Id.).  He eventually called 911 to get help for the girl.  (Id.).

He waited for the paramedics, opened the door for them and led them upstairs to the

girl.  (Id. at 574).  Petitioner also told the paramedics that the girl had been outside

playing at 5 a.m. and fell down.  (Id. at 575).  He assisted a paramedic in putting a

"diaper" on the girl during the paramedic's treatment of her.  (Id.).  Petitioner

remained at home while paramedics took the girl and her mother to the hospital.  (Id.

at 575).  When police arrived, the washing machine was running.  (Id. at 575).

Petitioner testified that Jacqueline Pagan had started the machine.  (Id. at 576).  He

eventually went to the police station, giving a statement to a detective.  (Id. at 577-

78).

Physical evidence also played a role in the trial.  Police forensic evidence

specialist Cindy Baldwin processed the crime scene.  (Id. at 267).  She collected

several items from the home.  (Id. at 273).  A bedspread from the master bedroom

was among these items.  (Id.).  Baldwin also found a pair of red boxer shorts and a

towel there.  (Id. at 273, 278).  Several other items came from the bathroom.  (Id. at

273).  Baldwin recovered a pair of underpants, a pair of pants and a towel from the

sink in that room.  (Id. at 275).  She took a shirt, two shoes and socks from on top of

the clothes hamper.  (Id.).  Inside that hamper Baldwin found a sock and two pairs of

underwear.  (Id.).  She also confiscated the trash can from the bathroom, which

contained a bloody sock and bloody tissue.  (Id.).  A second bedroom yielded a

sheet from the baby's bed and a set of sheets from the toddler's bed.  (Id. at 276).

From the washing machine, police recovered a sheet, a bedspread, a shirt, ten

socks, a hat and a pair of pajamas.  (Id.).  Baldwin also collected the bathroom's

shower curtain, which had blood on it.  (Id.).  Police later collected a pair of white

boxer shorts and a t-shirt worn by the petitioner at Harrisburg Hospital.  (Id. at 298-

99).  Baldwin sent a number of these items to the Pennsylvania State Police

laboratory for further testing.  (Id. at 320-22).

The forensic scientist who tested those items, Deborah Calhoun, also testified

in the case.  Calhoun conducted analysis of pubic hair combings, pulled hairs, saliva samples, a pair of red boxer shorts, items taken from defendant at the hospital, bed sheets, items from the hamper, items found in the bathroom sink, and towels from the sink and other parts of the house.  (Id. at 418).  Among all of the items Calhoun tested, she found eight with seminal fluid.  (Id.).  Calhoun reported that obtaining positive tests for semen had been difficult, despite the fact that the stains on the material appeared to be from semen.  (Id. at 419).  She had to perform three types of tests before establishing that the stains contained semen.  (Id.).

The items Calhoun tested were: a pair of red boxers; two flat sheets from the toddler's bed, one flowered and the other with a Rugrats design; a white towel from the bathroom sink; a pair of girl's underpants; girl's stretch pants from the bathroom sink; white boxers taken from the suspect at the hospital; and a comforter found in front of the washing machine.  (Id. at 420-21).  Calhoun also performed blood-typing tests on this material.  (Id. at 422).  Because their profiles were identical, Calhoun could not determine whether the stains belonged to the victim or her mother.  She did conclude, however, that none of the blood stains matched the petitioner.  (Id. at 423).  Calhoun then sent out samples of the material she had collected to a private laboratory, Cellmark Diagnostics ("Cellmark"), for DNA analysis.  (Id. at 423-5).

In his defense, petitioner presented the testimony of Jennifer Reynolds, director of the identity laboratory for Cellmark.  (Id. at 491).  Cellmark is a private company that specializes in testing biological evidence gathered from crime scenes.

(Id. at 492).  The company both performs DNA testing and reviews the testing of other laboratories to assess that lab's accuracy.  (Id. at 493).  The court allowed Reynolds to testify as an expert on DNA testing.  (Id. at 497).  She reported that Cellmark had tested a number of items provided by police investigators.  (Id. at 505).  These items included two cuttings from red boxer shorts, a multicolored sheet, a "Rugrats flat," a pair of underpants, stretch pants, a comforter, and blood swatches labeled with the name of the victim, the victim's mother, and the petitioner.  (Id.).

Reynolds reported that testing on the underpants included genetic material from two sources.  (Id. at 507).  The minor victim was the primary source of the DNA on that sample, and the other, "minor secondary source," belonged to a man.  (Id.).  The petitioner was excluded as a source for the sample, though the victim's mother was not.[2]  (Id.).  The multicolored sheet contained both a sperm and non-sperm "fraction."  The victim, her mother, and the petitioner were all excluded as sources of this material.  (Id. at 508).  The material came from another male.  (Id. at 509).  Testing of the Rugrats sheet found DNA from two people, one male and one female.  (Id.).  The petitioner could not be excluded as a source of the male material.  (Id.).  Neither the victim nor her mother could be excluded as a source of the female material.  (Id.).  The sheet also contained DNA evidence from another individual who was not one of the three for which the tests were conducted.  (Id. at 509-10).

_____

[2]The witness did not offer an explanation for the seeming discrepancy between her testimony that the material belonged to a man and possibility to the victim's mother.

Jenkins explained that the fact that the sample tested was a mixture of various samples, and that the test could not therefore be conclusive.  (Id. at 510).  On cross examination, Reynolds admitted that her testing could not reveal the way that material came to land on a sample.  (Id. at 521).  The underpants were found in the bathroom sink, and the secondary source on them could have come from that sink. (Id.).  In the same way, the victim's brother could have slept on the Rugrats sheet. (Id.).  The lab did not have a genetic sample from him, and the material could have been his.  (Id. at 521-22).  Indeed, Reynolds found that much of the DNA testing her laboratory performed was "inconclusive."  (Id. at 522).  Finding the identity of the male donor was difficult because a semen sample was present, but no sperm, which provides more definitive evidence of identity.  (Id. at 526).

William Shields, a professor of biology at the State University of New York, College of Environmental Sciences and Forestry in Syracuse, New York, testified as an expert for the petitioner.  (Id. at 526, 536).  Dr. Shields disputed the conclusion reached in Cellmark's report that petitioner could not be excluded as a donor of the male genetic material on the Rugrats sheets.  (Id. at 551-52).  He also argued that some of the seminal material that the report had failed to identify must have come from an unidentified male adult.  (Id. at 553).

The court finds that a rational trier of fact could have found the petitioner guilty beyond a reasonable doubt based on the evidence presented at trial.  To be sure, the DNA evidence to which petitioner points does not implicate him, but it also does

not exclude him or prove that another person attacked the victim.  While popular

television programs may imply otherwise, DNA evidence does not always "solve" a

case.  The DNA evidence in this case was inconclusive, and the jury had to weigh

that evidence against testimony that the victim had identified petitioner as her

attacker to numerous individuals, evidence of physical injuries, both internal and

external, that implicated him in sex with a child, the petitioner's inconsistent

statements to investigators, and circumstantial evidence that placed petitioner at the

scene of the crime at the time it occurred.   While a jury may have found reasonable

doubt when no scientific evidence actually connected the petitioner to the harm the

victim suffered, the court cannot find the jury's view that the evidence established

petitioner's guilt beyond a reasonable doubt irrational.  The jury had to make

credibility determinations based on the testimony of the various witnesses in the

case, and did so.  Petitioner also contends that the presence of "Peachy" in the

home on the day of the incident and the unidentified genetic material on the sheets

should have implicated him in the crime.   The jury considered this evidence

concerning Peachy, and did not find that it cast reasonable doubt on the petitioner's

guilt.

     In viewing the evidence in the light most favorable to the prosecution, then, the

court finds that a "rational trier of fact could have found proof beyond a reasonable

doubt." Jackson, 443 U.S. at 323.  The court therefore finds that the evidence was

sufficient to convict the petitioner beyond a reasonable doubt.  The court will adopt

27

the magistrate judge's recommendation on this point.

### B. Procedural Default

The magistrate judge found that petitioner had procedurally defaulted claims 1, 3 and 4 in state court and thus could not raise them in his habeas corpus petition. Petitioner objects to this finding.

The Supreme Court has found that "[i]n all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that the failure to consider the claims will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 750 (1991). "To show cause, a petitioner must demonstrate some objective factor external to the defense that prevented compliance with the state's procedural requirements." Keller v. Larkins, 251 F. 3d 408, 415 (3d Cir. 2001). "An allegation of 'actual innocence,' if credible, is one such 'miscarriage of justice' that enables courts to hear the merits of the habeas claims." Hubbard v. Pinchak, 378 F.3d 333, 338 (3d Cir. 2004).

Petitioner does not appear to assert that he can establish cause for and actual prejudice from the default. His briefs do not attempt to provide a cause for his default, but instead re-assert his constitutional claims.   Because petitioner offers neither cause nor prejudice, he needs to present evidence of actual innocence for

28

the court to consider his procedurally defaulted claims.  A properly made claim of

actual innocence excuses any procedural default and allows the court to consider

the constitutional claims that were procedurally defaulted.  See Schlup v. Delo, 513

U.S. 298, (1995) (petitioner's claim of innocence was "not itself a constitutional

claim, but instead a gateway through which a habeas petitioner must pass to have

his otherwise barred constitutional claim considered on the merits.") (citations

omitted).  To establish a claim of actual innocence that entitles a petitioner to relief,

that petitioner "must show 'it is more likely than not that no reasonable juror would

have convicted him in light of the new evidence' presented in his habeas petition."

Hubbard, 378 F.3d at 339 (quoting Calderon v. Thompson, 523 U.S. 538, 559

(1998)).  In the context of a habeas petition which is the subject of procedural

default, this burden is "very high," and applies only to "a 'narrow class of cases,' i.e.,

in 'extraordinary instances when a constitutional violation probably has caused the

conviction of one innocent of the crime.'" Goldblum v. Klem, 510 F.3d 204, 225 (3d

Cir. 2007) (quoting McCleskey v. Zant, 499 U.S. 467, 494 (1991)).  Accordingly, "a

petitioner does not meet the threshold requirement unless he persuades the district

court that, in light of the new evidence, no juror, acting reasonably, would have voted

to find him guilty beyond a reasonable doubt."  Goldblum, 510 F.3d at 226.[3]

  Petitioner has not offered any new evidence which the court could consider in

---

[3]The Supreme Court has defined "new reliable evidence" as "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence–which was not presented at trial." Schlup, 513 U.S. at 324.

determining that he had a claim of actual innocence.  In addition, as explained above, the evidence presented at trial was sufficient to support a conviction and avoid any violations of petitioner's federal due process rights.  No evidence of actual innocence exists.  As such, petitioner's procedurally defaulted claims may not be considered by the court, and the petition denied on those grounds.

**Conclusion**

For the reasons stated above, the court will adopt the report and recommendation and the instant petition for a writ of habeas corpus will be denied. An appropriate order follows.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOSE LUIS SANTOS,** | : | **No. 3:06cv2472** |
| **Petitioner** | : | |
| | : | **(Judge Munley)** |
| **v.** | : | |
| | : | |
| **DAVID DIGUGLIELMO,** | : | |
| **THE DISTRICT ATTORNEY OF** | : | |
| **DAUPHIN COUNTY,** | : | |
| **PENNSYLVANIA, and** | : | |
| **THE ATTORNEY GENERAL OF THE** | : | |
| **STATE OF PENNSYLVANIA,** | : | |
| **Respondents** | : | |

## ORDER

**AND NOW**, to wit, this 15th day of December 2008, the petitioner's objections (Doc. 50) to the report and recommendation of Magistrate Judge Malachy E. Mannion (Doc. 49) are hereby **OVERRULED**.  The report and recommendation is hereby **ADOPTED**.  The petition for a writ of *habeas corpus* (Doc. 1-1) is hereby **DENIED**, and the Clerk of Court is directed to **CLOSE** the case.   The court declines to issue a certificate of appealability.


**BY THE COURT:**


**s/ James M. Munley**
**JUDGE JAMES M. MUNLEY**
**UNITED STATES DISTRICT COURT**